IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

KEVIN BROWN,

*Plaintiff,*

v.

DEVELOPMENT SERVICES GROUP,
INC. et al.,

*Defendant.*

)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 4:25-cv-01284-JMD

## ORDER GRANTING MOTION TO DISMISS

The Fair Housing Amendments Act of 1988 requires some residential buildings to contain handicap-accessible features.  42 U.S.C.S. § 3604(f)(3)(C).  But that requirement applies only to buildings where "first occupancy" occurred after March 13, 1991.  *Id.*  The building here was converted to residential use around 2023, but it was originally constructed around 1906 for commercial purposes.  Kevin Brown argues that "first occupancy" refers only to first *residential* occupancy, not to other forms of occupancy, so he thinks the building must have those features required by the Act.  The Court disagrees. Consistent with the Department of Housing and Urban Development's longstanding interpretation, the Court concludes that this statutory provision applies only to new construction after 1991, not renovations that occurred after 1991.  The case is dismissed.

### Background

Because the defendant developers move to dismiss, the Court "assume[s] the truth of all factual allegations in the complaint." *Delker v. MasterCard Int'l, Inc.*, 21 F.4th 1019, 1024 (8th Cir. 2022).  Brown, who uses a wheelchair, visited a building called The Victor in 2024 while researching St. Louis properties.  He observed several accessibility barriers that could interfere with his ability to use the property and that he says "deterred" him from renting an

1

apartment.   For example, he says the mailboxes were "too high for persons who use wheelchairs."  ECF 1 at ¶ 41.  Brown says that the developers have "discriminated in the rental of, or otherwise made unavailable or denied, dwellings to persons because of their disabilities."  ECF 1 at ¶ 50.

The building was used for commercial purposes before 1991 and only recently renovated for residential use.  The developers provided public records of this fact, which Brown did not dispute.  *See* ECF 16; ECF 30.  Although the building's history does not appear in the complaint, the Court "may take judicial notice of public records and may thus consider them on a motion to dismiss."  *Stahl v. U.S. Dep't of Agric.*, 327 F.3d 697, 700 (8th Cir. 2003).  Based on the public records, the Court takes judicial notice that The Victor was originally known as the "Butler Brothers Building" warehouse, was constructed in 1906, and was used for commercial purposes before 1991.  ECF 16 at ¶ 3.  The developers purchased the property in 2020 and transformed it into a mixed-use complex with 384 apartments.

## Analysis

The Court first addresses jurisdiction and then the merits.

## I.

The Court is skeptical that it has jurisdiction over this case.  It appears that Brown may be an antidiscrimination "tester," a person who "has no intention" of renting an apartment in a building governed by disability-access laws.  *See Acheson Hotels, LLC v. Laufer*, 601 U.S. 1, 5 (2023) (Thomas, J., concurring in the judgment).  Brown filed a bevy of lawsuits in this Court against other facilities around the same time as this one.  *E.g.*, *Brown v. Aventura at Hawk Ridge, LLC et al.,* No. 4:25-cv-01287-CMS (Aug. 26, 2025); *Brown v. BIT Streets of St Charles, LLC et al.,* No. 4:25-cv-01300-CMS (Aug. 27, 2025); *Brown v. LuxLiving, LLC et al.,* No. 4:25-cv-01472-SRC (Sept. 30, 2025); *Brown v. Keeley Properties, LLC et al.,*

No. 4:25-cv-01474-SEP (Oct. 1, 2025); *Brown v. Steelcote Gratiot, LLC et al.,* No. 4:26-cv-00136-MAL (Jan. 1, 2026).  Perhaps Brown has been extraordinarily unlucky in obtaining housing.  But perhaps more plausibly, Brown has no actual interest in renting a unit; he instead has an interest in filing lawsuits to extract settlements.  Brown does little in his complaint to dispel this concern.  He never clearly states that he would have rented at The Victor but for the alleged violations.  Instead, he vaguely suggests he was "deterred" from renting.  ECF 1 ¶ 34.

That is a problem because there is a compelling argument that "testers" lack standing to bring these kinds of claims.  *Acheson Hotels*, 601 U.S. at 10–14 (Thomas, J., concurring in the judgment) (concluding "testers" lack standing to enforce Title III of the Americans with Disabilities Act).  The statute here prohibits discrimination "in the sale or rental" of a unit; the lack of accessibility features must "deny" a person the ability to rent.  § 3604(f).  But Brown does not allege that he in fact wanted to rent or would have rented.  So this case is different from *Havens Realty Corp. v. Coleman,* where the Supreme Court found standing for testers to sue to enforce a different provision of the Fair Housing Act.  455 U.S. 363 (1982).  Unlike § 3604(f), that different provision creates "a legal right to truthful information," which the testers in that case were denied.  *Id.* at 373.  Indeed, *Havens* took pains to distinguish that provision of the Fair Housing Act from provisions that require an actual interest in renting.  *Id.* at 374 ("Whereas Congress, in prohibiting discriminatory refusals to sell or rent in § 804(a) of the Act, 42 U.S.C. § 3604(a), required that there be a 'bona fide offer' to rent or purchase, Congress plainly omitted any such requirement insofar as it banned discriminatory representations in § 804(d).").  Brown is not suing over the denial of information; he is suing over the denial of a rental that he never clearly states he wanted.

Nonetheless, at this early stage of litigation, the issue is sufficiently unclear.  A (perhaps overly generous) reading of the complaint could support standing.  And the case is

dismissible for other reasons. So instead of asking for briefing on this issue, the Court proceeds to assess the pure question of law, already briefed: whether the Act applies to a building that was used for nonresidential purposes before 1991.

## II.

Whether the Fair Housing Amendments Act of 1988 governs buildings that were occupied for nonresidential purposes before 1991 depends on the phrase "first occupancy" in the Act. Congress made it "unlawful" to "discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of that buyer or renter." § 3604(f)(1)(A). And Congress defined "discriminate" to include the failure of a landlord to include certain accessibility features. § 3604(f)(3)(C). But this accessibility requirement applies only to "the design and construction of covered multifamily dwellings for first occupancy after" 1991. *Id.* The parties do not dispute that the building was first occupied for nonresidential purposes well before 1991. Brown argues instead that what matters is that the building was first occupied for residential purposes after 1991. The Court disagrees.

Start with the plain meaning. "We begin, as always, with the text of the statute." *Permanent Mission of India to the United Nations v. City of New York*, 551 U.S. 193, 197 (2007). The phrase "first occupancy" is not defined, so the Court "give[s] the term its ordinary meaning." *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 85 (2018). And the ordinary meaning of the term refers to any use of a building, not just residential use. *E.g.*, *Occupancy*, Black's Law Dictionary (5th ed. 1979; 6th ed. 1990) ("Taking possession of property and use of the same."); *Occupancy*, Ballentine's Law Dictionary (3d ed. 1969) (defining "occupancy" as merely "[t]he use of premises"). Nothing about the ordinary meaning of "occupancy" suggests only residential occupancy rather than any occupancy.

4

What the plain meaning suggests, other parts of the statute reinforce.   Where Congress wanted "occupancy" to mean only residential occupancy, Congress said so. Congress defined "dwelling" to mean a building that is "occupied as, or designed or intended for occupancy as, a *residence*."   42 U.S.C. § 3602(b) (emphasis added).   Congress thus expressly recognized that "occupancy" ordinarily carries a broader meaning and must be limited expressly if meant to convey only residential occupancy.   If Congress had similarly wished to limit "occupancy" in § 3604, "it knew exactly how to do so." *SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 365 (2018).   This Court cannot "add" words that Congress chose to omit.   *E.g.*, *62 Cases, More or Less, Each Containing Six Jars of Jam v. United States*, 340 U.S. 593, 596 (1951).

This interpretation is reinforced by the term "construction" appearing in the larger phrase "construction of covered multifamily dwellings for first occupancy."   The parties cite one—and only one—case that has addressed the question currently before this Court.   *See Fair Hous. Rts. Ctr. in Se. Pennsylvania v. Post Goldtex GP, LLC*, 823 F.3d 209, 215 (3d Cir. 2016); *see also Collins v. PRG Real Est.*, No. 3:14-CV-647-DJH-DW, 2017 WL 1146952, at *2 (W.D. Ky. Mar. 27, 2017), *aff'd,* No. 17-5534, 2018 WL 2166214 (6th Cir. Apr. 4, 2018) (not cited by the parties but adopting the Third Circuit's interpretation).   That court determined that the statute was ambiguous after it concluded that it is possible to read the phrase "construction of . . . dwellings" to mean renovation of an existing building.   *Post Goldtex GP*, 823 F.3d at 215.   This Court disagrees.   The term "construction" undercuts Brown's argument.   When the statute was enacted, contemporary dictionaries defined "construction" most naturally to mean "[t]he creation of something *new*, as distinguished from the repair or improvement of something already existing." *Construction*, Black's Law Dictionary (5th ed. 1979; 6th ed. 1990) (emphasis added).   The developers here did not "construct" a residential

5

building in 2023; they renovated and converted an existing building into residential dwellings.

Also weighing against Brown's reading are the parts of the statute that govern exterior physical features. Brown's reading has some surface-level, logical appeal, because when a developer guts a building's interior to convert it to residential use, that interior renovation may be little different from new construction. But the statute governs more than just interior development. It also requires, among other things, wheelchair-accessible ramps and wider external doors. § 3604(f)(3)(C). So under Brown's reading, the statute imposes a significant economic barrier to converting buildings to residential use. Congress does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns., Inc.*, 531 U.S. 457, 468 (2001). Where Congress has expressly grandfathered in older buildings to minimize costs of new legislation, an interpretation that might make renovating many of those buildings impractical is unlikely to be the strongest interpretation. *Cf. Van Buren v. United States*, 593 U.S. 374, 394 (2021) ("[T]he fallout underscores the implausibility of the Government's interpretation.").

Finally, the Court's interpretation dovetails with the longstanding, unbroken interpretation of the Department of Housing and Urban Development. To be clear, a court cannot defer to an agency's interpretation of a statute. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024). But agency interpretations, because they "'constitute a body of experience and informed judgment,'" may be persuasive, and agency "interpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful." *Id.* (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). Here, the Department defines "first occupancy" as "a building that has never before been used for *any* purpose." 24 C.F.R. § 100.201 (emphasis added). That has been the consistent definition since 1989. 54 Fed. Reg. 3232, 3244 (Jan. 23, 1989). Just days before the Act's

requirements became effective, the Department published its Final Fair Housing Accessibility Guidelines.  56 Fed. Reg. 9472 (Mar. 6, 1991).  It addressed comments from parties concerned about the Act's conflict with historic preservation design codes and said, "Existing facilities that are converted to dwelling units are not subject to the Act's accessibility requirements.  Additionally, alteration, rehabilitation or repair of covered multifamily dwellings are not subject to the Act's accessibility requirements.  The Act's accessibility requirements only apply to new construction."  *Id.* at 9477.  Again, agency interpretation can be persuasive only; it deserves no deference.  But here "[i]t is 'extra icing on a cake already frosted.'"  *Van Buren*, 593 U.S. at 394 (quoting *Yates v. United States*, 574 U.S. 528, 557 (2015) (Kagan, J., dissenting)).

Against all this, Brown invokes legislative history, devoting half the argument section of his brief to floor statements and House reports.  But "the problems with legislative history are well rehearsed." *Wooden v. United States*, 595 U.S. 360, 381 (2022) (Barrett, J., joined by Thomas, J., concurring).  "In the interpretation of legislation, we aspire to be 'a nation of laws, not of men.'  This means (1) giving effect to the text that lawmakers have adopted and that the people are entitled to rely on, and (2) giving *no* effect to lawmakers' unenacted desires." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 29 (2012).  The problem with relying on floor statements is obvious: a single member's statement may be great evidence of what that member thinks, but it is hardly probative of what 535 members of Congress think, much less (and more importantly) what the words of the statute mean to an ordinary member of the public. *See Kisor v. Wilkie*, 588 U.S. 558, 594 (2019) (Gorsuch, J., concurring in the judgment) (stating that the "original public meaning" is what governs).  The problems with committee reports are less immediately intuitive to those not familiar with congressional procedure, but they are no less profound: members of Congress rarely read these reports; they typically have no way to amend them; and they are

often written not by members, but by unelected staffers.  As Justice Scalia pointed out, an "illuminating exchange" once occurred on the floor of the Senate highlighting all these problems succinctly:

> Mr. [WILLIAM] ARMSTRONG. My question, which may take [the chairman of the Committee on Finance] by surprise, is this: Is it the intention of the chairman that the Internal Revenue Service and the Tax Court and other courts take guidance as to the intention of Congress from the committee report which accompanies this bill?
>
> Mr. [BOB] DOLE. I would certainly hope so.
>
> Mr. ARMSTRONG. Mr. President, will the Senator tell me whether or not he wrote the committee report?
>
> Mr. DOLE. Did I write the committee report?
>
> Mr. ARMSTRONG. Yes.
>
> Mr. DOLE. No; the Senator from Kansas did not write the committee report.
>
> Mr. ARMSTRONG. Did any Senator write the committee report?
>
> Mr. DOLE. I have to check.
>
> Mr. ARMSTRONG. Does the Senator know of any Senator who wrote the committee report?
>
> Mr. DOLE. I might be able to identify one, but I would have to search. I was here all during the time it was written, I might say, and worked carefully with the staff as they worked
>
> Mr. ARMSTRONG. Mr. President, has the Senator from Kansas, the chairman of the Finance Committee, read the committee report in its entirety?
>
> Mr. DOLE. I am working on it. It is not a bestseller, but I am working on it.
>
> Mr. ARMSTRONG. Mr. President, did members of the Finance Committee vote on the committee report?
>
> Mr. DOLE. No.
>
> Mr. ARMSTRONG. Mr. President, the reason I raise the issue is not perhaps apparent on the surface, and let me just state it: The report itself is not

8

considered by the Committee on Finance. It was not subject to amendment by the Committee on Finance. It is not subject to amendment now by the Senate.

If there were matter within this report which was disagreed to by the Senator from Colorado or even by a majority of all Senators, there would be no way for us to change the report. I could not offer an amendment tonight to amend the committee report.

For any jurist, administrator, bureaucrat, tax practitioner, or others who might chance upon the written record of this proceeding, let me just make the point that this is not the law, it was not voted on, it is not subject to amendment, and we should discipline ourselves to the task of expressing congressional intent in the statute."

*Hirschey v. FERC*, 777 F.2d 1, 7 n.1 (D.C. Cir. 1985) (cleaned up) (quoting 128 Cong. Rec. S8659 (daily ed. July 19, 1982)).  Whatever courts may have done in decades past, the notoriously unreliable tool of legislative history carries no persuasive force. "[I]t is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998).

### Conclusion

The relevant part of the Act exempts buildings that were occupied for any purpose before 1991.  The Victor was used—and therefore first occupied—starting in 1906, and its 2023 renovation cannot change that fact.  The property is exempt from the statute's requirements governing accessibility.  The Court **GRANTS** the developers' motion to dismiss, ECF 17, and **GRANTS** their unopposed motion for judicial notice in support of their motion to dismiss, ECF 16.

Dated this 24th day of July, 2026

_____
JOSHUA M. DIVINE
UNITED STATES DISTRICT JUDGE
FOR THE EASTERN AND WESTERN
DISTRICTS OF MISSOURI

9